865 F.2d 1267
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sandra S. EDDY, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of Health & Human Services,
Defendant-Appellee.
 No. 87-1198.
 United States Court of Appeals, Sixth Circuit.
 Jan. 4, 1989.
 
 Before WELLFORD and BOGGS, Circuit Judges and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Plaintiff, Sandra Eddy (Eddy) seeks review of the district court's grant of summary judgment to the Secretary of Health and Human Services in her action challenging the Secretary's denial of her claim for social security benefits.
 
 
 2
 Eddy applied for disability insurance and supplemental security income benefits on June 20, 1984 alleging disability due to a back injury and pinched nerves that rendered her unable to work in March of 1984. Her applications were denied initially and upon administrative reconsideration by the Social Security Administration.
 
 
 3
 At the time of the hearing, Eddy was forty-five years old, weighed 140 pounds, and had completed a ninth grade education. Her varied work history included two to three year stints during the period 1966 through 1979 as a nurse's aide, carton assembler, machine assembler, machine operator in a plastics company, security guard, restaurant manager, and receptionist in an apartment building. From 1979 until March of 1984, Eddy worked as a sandwich maker on an assembly line for Quality Dairy Company.
 
 
 4
 Eddy developed severe pain in her lower back radiating down her right leg to the ankle while moving a meat slicer at Quality Dairy Company in June of 1981. She first saw Dr. Ronald J. Jakubiak in July of 1981 seeking treatment for her back injury. Dr. Jakubiak diagnosed right sciatica[1] and scheduled Eddy for further testing.
 
 
 5
 A lumbar epidural venography was performed in July of 1981. In September 1981, a lumbar myelogram demonstrated a possible bulging disc between L4 and L5. Dr. Jakubiak obtained good results with a facet nerve block and on October 22, 1981, performed a facet rhizotomy[2] at the L4-5 and L5-S1 levels based upon a diagnosis of facet block syndrome. Eddy tolerated the procedure well.
 
 
 6
 She later returned to Dr. Jakubiak in February of 1982 complaining of continued lower back pain radiating into her right leg. Dr. Jakubiak scheduled a CT scan of Eddy's lower back, which revealed disc herniation at the L4-5 level, although the L3-4 and L5-S1 levels appeared normal. Eddy therefore underwent a second back operation in May of 1982. Her post-operative recovery was described as excellent, and ambulation occurred during the three days following the procedure.
 
 
 7
 In July of 1982, Dr. Jakubiak reported that Eddy was "doing well" after her lumbar laminectomy. He placed her on a lifting restriction of twenty-five pounds and advised her to commence an exercise program and to continue it "without fail." Eddy complained about minor lower back, hip and knee pain related to constant standing on her job, but she rejected Dr. Jakubiak's suggestion of job restriction because she believed that she could not continue her job with restrictions. Subsequently, after another visit, Dr. Jakubiak cautioned her to do no excessive twisting or bending and no standing for periods of longer than an hour at a time. This situation continued throughout 1983 with added complaints of arm, back, and buttock pain. He continued her job restrictions.
 
 
 8
 In early 1984, Dr. Jakubiak referred Eddy to the Henry Ford Hospital where she was given a neuropsychological examination and another EMG, this time of her lower back and left lower extremity. The EMG results were normal, with no evidence of left or right lumbrosacral radiculopathy (disease of spinal nerve roots) or peripheral neuropathy (disorder affecting any segment of the nervous system) in the left lower extremity. The Minnesota Multiphasic Personality Inventory administered to her revealed that Eddy suffered no significant depression or affective disturbance. The impression of the examiners was of "an individual who has a propensity to develop somatic complaints under stress and/or to focus excessively on organically-based physical symptoms." The hospital notes reflected that Eddy's "clinical profile is not infrequent among the individuals who have an actual organic etiology to their complaints." Hospital personnel, however, did not believe Eddy was "deliberately malingering."
 
 
 9
 In May of 1984, Eddy was examined by Dr. J. Wulff, who had apparently seen Eddy on at least one other occasion. Dr. Wulff found evidence only of a muscle spasm; the patient was able to walk on her heels and toes, walk, squat, climb stairs and get on and off the examining table. Her gait was normal.
 
 
 10
 Because of Eddy's continued complaints of pain requiring occasional bed rest at home, Dr. Jakubiak scheduled Eddy for another lumbar myelogram on August 27, 1984. In September, Dr. Jakubiak saw Eddy and suggested another lumbar laminectomy at the L4-5 level for her left-sided low back and leg pain. The surgery was performed in October of 1984 without complications. At a follow-up visit in November of 1984, Dr. Jakubiak noted that Eddy was "much improved following her last surgery." Eddy continued to complain of some low back pain accentuated by exposure to cold, and pain radiating into her leg caused by prolonged walking, twisting, or turning. Eddy advised Dr. Jakubiak that she worked in a cold environment at Quality Dairy and was required to hold objects outstretched in her arms and to twist her trunk. Dr. Jakubiak last saw Eddy in March of 1985 and recommended no further surgical procedure.
 
 
 11
 In a letter dated July 16, 1985, Dr. Jakubiak stated that Eddy could work with the following restrictions: "No lifting, no bending, no excessive twisting or turning. Not to stand more than 1 hour in an 8 hour period." Nine days later, on July 25, 1985, however, Dr. Jakubiak wrote that Eddy was "totally disabled from any and all work. She continues with pain in her back while sitting, walking, standing or lifting. She is unable to do even the lightest of work as a result of [her work related] injury." These reports are obviously inconsistent.
 
 
 12
 At the hearing before the Administrative Law Judge, Eddy testified that she had suffered constant crippling pain since June of 1981. She was given special treatment at Quality Dairy to the extent that she was allowed to sit on a stool while making sandwiches on an assembly line from a conveyor belt. She testified that her work caused her continuous pain since 1981, and that she could find no comfortable bodily position free from pain. She could not sit or stand for any length of time with getting stiff or having her legs give out. She further testified that her grouchiness and irritability had destroyed her marriage. Her divorce was finalized in January of 1982, and her husband further substantiated this contention regarding the circumstances of their divorce.
 
 
 13
 A vocational expert, Dr. Donald Hecker, also testified at Eddy's hearing. He described Eddy's work at Quality Dairy as unskilled, with a medium exertional level before her injury, and sedentary subsequent to her injury because of her "favored" status. Other past employment, Dr. Hecker opined, was of a semi-skilled nature, providing Eddy with the transferable skills of working independently in a managerial situation, dealing with people in a retailing situation, and maintaining records. Dr. Hecker identified a number of clerical positions to which those skills would transfer, of which approximately 8,000 existed in the lower peninsula of Michigan and would not be precluded by either her ninth grade education or limitations of no bending, twisting, or turning and no more than one hour of standing during an eight hour day. Dr. Hecker agreed that the jobs he identified would require Eddy to be at work on a regular basis, and that these positions would be ruled out if her testimony was found to be credible.
 
 
 14
 The ALJ found that Eddy had a severe impairment consisting of continued low back pain and limitations following lumbosacral surgery. Although Eddy's impairment precluded her from performing her past work, the ALJ found that she retained the residual functional capacity to perform the limited range of sedentary work described by the vocational expert, which did not require the bending or twisting of her past work and would be performed in a warm, dry environment. Considering Eddy's education, age, and transferable skills, the ALJ found Eddy not disabled.
 
 
 15
 In determining that Eddy had the residual functional capacity to perform a limited range of sedentary work, the ALJ considered both her physical limitations and her testimony of persistent pain, as well as her proclivity towards overreaction to pain. He determined that the medical evidence indicated that Eddy experienced favorable effects from her operations, and was not physically precluded from performing the undemanding jobs identified by the vocational expert where the physical requirements and environment she felt had exacerbated her condition were absent. He discounted Dr. Jakubiak's final letter of July 25, 1985.
 
 
 16
 The ALJ also carefully considered Eddy's subjective complaints, and her proclivity toward overreaction to pain, with regard to her capacity for 12 continuous months to perform the jobs cited by the vocational expert. The ALJ found Eddy's testimony to have limited credibility. The ALJ noted the lack of a diagnosis of mental impairment in the record. The Appeals Council denied Eddy's request for review. The district court referred this dispute to a magistrate, who determined that "ample objective signs and diagnostic tests" corroborated the existence of Eddy's pain. Because pain is a subjective phenomenon, and because Eddy's neuropsychological examination had revealed that Eddy was not deliberately malingering, the magistrate concluded that Eddy's testimony of disabling pain should have been credited entitling her to benefits. The district court rejected the magistrate's recommendation and granted the Secretary's motion for summary judgment. Eddy timely appealed.
 
 
 17
 We have made an effort to recount the record in some detail. After considering this record and the findings of the Secretary we find that there is substantial evidence to support the Secretary's conclusion of no proof of a permanent disability. We are persuaded, nevertheless, based upon the reported surgical procedures administered due to continued back difficulties experienced by Eddy, that she did experience during the relevant period twelve consecutive and continuous months of disability under the Act so that she is entitled to benefits for that twelve month period only.
 
 
 18
 Except for the twelve month award, for the period beginning May 1, 1984, we affirm the decision of the Secretary.
 
 
 
 [1]
 Sciatica is defined as "pain in the lower back and hip radiating down the back of the thigh into the leg, usually due to herniated lumbar disc, but occasionally to sciatic neuritis [inflammation of the sciatic nerve]." Stedman's Medical Dictionary (Stedman's) 1262 (5th Ed. 1982)
 
 
 [2]
 Rhizotomy is defined as a "section of the spinal nerve roots for the relief of pain or spastic paralysis." Stedman's at 1234